**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| HILDA MAE JONES, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-09-3095 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #2). Cross-motions for summary judgment have been filed by Plaintiff Hilda Mae Jones ("Plaintiff," "Jones") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Motion for Summary Judgment on Behalf of Plaintiff Hilda Mae Jones and Memorandum in Support of Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #10; Defendant's Cross-Motion and Memorandum in Support of Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #8). Each party has filed a response to the competing motions. (Plaintiff's Response to Defendant's Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #14; Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry #11). After considering the pleadings, the administrative transcript, and the applicable law, it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be DENIED.

**Background**

On April 8, 2008, Plaintiff Hilda Mae Jones filed an application for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"). (Transcript ["Tr."] at 54).  In her application, Jones claimed that she had been unable to work since October 12, 2007, because she had undergone a "total right knee replacement," and because she suffered from osteoarthritis[1] in both knees.  (Tr. at 125, 166).  The SSA denied her application on June 18, 2008, finding that Jones is not disabled under the Act.  (Tr. at 54).  Jones petitioned for a reconsideration of that decision, but the SSA again denied her benefits, on August 18, 2008.  (Tr. at 55).

On September 15, 2008, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 68-69).  That hearing, before ALJ Wendy Hunn, took place on February 20, 2009.  (Tr. at 14).  Plaintiff appeared with a non-attorney representative, Cynthia Lachowski ("Lachowski"), and she testified on her own behalf.  (Tr. at 8, 14).  The ALJ also heard testimony from Susan Rapant ("Rapant"), a vocational expert.  (*Id.*).  On April 8, 2009, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

---

[1] "Osteoarthritis" is a disease "characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and change in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1286 (29th ed. 2000).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well settled that, under this analysis, the claimant bears the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

3

impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as her review of the evidence of record, the ALJ determined that Jones suffers from "osteoarthritis in both knees, status post right knee replacement," and that these impairments are "severe." (Tr. at 10). She found, however, that Jones "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (*Id.*). Next, the ALJ determined that Jones is able to perform her past work as a "customer service representative." (Tr. at 10-12). She found, as well, that Jones has the residual functional capacity ("RFC") to perform a broad range of sedentary work, provided that she is able to alternate from sitting to standing every 30 to 45 minutes, to use a cane, and to elevate her feet up to 12 inches, as needed. (*Id.*). With these findings, the ALJ concluded that Jones "has not been under a disability, as defined in the Social

Security Act, from October 12, 2007 through the date of this decision," and she denied her application for disability insurance benefits.  (Tr. at 13).

In response to that decision, Jones filed a request for the Appeals Council to review the ALJ's decision.  (Tr. at 4).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:

> (1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest.

20 C.F.R. §§ 404.970 and 416.1470.  On July 27, 2009, the Appeals Council denied her request, finding that no applicable reason for review existed.  (Tr. at 1-3).  With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On September 24, 2009, Jones filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the decision.  (Complaint, Docket Entry #1).  Subsequently, the parties filed cross-motions for summary judgment.  After considering the pleadings, the administrative transcript, and the applicable law, the court recommends that Defendant's motion be granted, and that Plaintiff's motion be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id*. (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere

5

scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her condition; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the ALJ's findings on two grounds.  (Plaintiff's Motion at 4-5).  She claims that the ALJ erred by finding that she "does not have an impairment that meets one of the listed impairments."  (*Id*. at 4).  She also argues that the ALJ erred in concluding that she "has the residual functional capacity to perform a broad range of sedentary work . . ., including past relevant work as a customer service representative."  (*Id*. at 4-5).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Response at 1-7).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records, dating from June 2005, show that Jones was a regular patient of Dr. Kerry Laursen ("Dr. Laursen"), a family practitioner.  (Tr. at 245-95, 392-97).  Dr.

6

Laursen treated Jones for a number of ailments, including allergies, hypertension, chest pain, high cholesterol, and arthritis. (*See id.*). On October 26, 2006, Jones saw Dr. Laursen and complained of pain in her left hamstring and calf. (Tr. at 253). Jones told the doctor that she "was moving boxes yesterday [at work], but did not have pain until she had been sitting for some time." (*Id.*). Dr. Laursen examined Jones, and found tenderness and warmth in her left hamstring and a decreased range of motion. (*Id.*). From that date forward, Dr. Laursen's records made references to Jones's leg and knee pain. (Tr. at 246-64). In November 2006, she noted that Jones had begun treatment for those conditions with Dr. Thaddeus Hume (Dr. Hume"), an orthopedic surgeon. (Tr. at 246-52). In October 2006, and again on March 4, 2007, Dr. Laursen administered steroid injections to treat pain due to osteoarthritis and crepitus[2] in both of Plaintiff's knees. (Tr. at 248). She noted, again, that Dr. Hume was treating Jones for leg and knee pain, and stated that he was considering surgical intervention. (*Id.*). On June 16, 2007, Dr. Laursen noted that Jones was suffering from advanced osteoarthritis in her right knee. (Tr. at 247, 262-63). On September 4, 2007, Dr. Laursen wrote that Jones was suffering from swelling, pain, and decreased mobility in both knees. (Tr. at 246). In October 2007, Dr. Laursen reported that Jones was suffering from osteoarthritis in both knees, and that she had been scheduled for a total right knee replacement on October 31, 2007. (Tr. at 259-60).

On January 23, 2008, Dr. Laursen reported that Jones's symptoms of osteoarthritis in her right knee were improving following the surgery. (Tr. at 258). On February 18, 2008, Dr. Laursen noted that Jones was "still very impaired despite surgery," because of osteoarthritis in her knees. (Tr. at 257). She encouraged Jones to get a permanent disability sticker for her car.

---

[2] "Crepitus," or "crepitation," is a "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." STEDMAN'S MEDICAL DICTIONARY 423-24 (27th ed. 2000).

(*Id.*).   On March 18, 2008, Dr. Laursen reported that Jones was suffering from "severe knee osteoarthritis." (Tr. at 256).   She repeated that diagnosis on April 22, 2008. (Tr. at 255).   Dr. Laursen wrote that Dr. Hume was "planning for [Jones] to be on long term disability." (*Id.*).   On June 24, 2008, Dr. Laursen reported that Jones continued to suffer from bilateral knee pain, and also from leg weakness, for which she was receiving physical therapy and medication under Dr. Hume's care.   (Tr. at 392-33).   On October 8, 2008, Dr. Laursen reported that Jones was suffering from knee pain due to osteoarthritis. (Tr. at 424).   On January 30, 2009, Dr. Laursen examined Jones, and completed a "lower extremities questionnaire" and a "rest questionnaire." (Tr. at 418-22).   Dr. Laursen reported that Jones's pain was severe.   (Tr. at 419).   She stated that this pain interfered with Jones's "ability to maintain attention and concentration sufficient to complete tasks in a timely manner" on an "occasional[]" basis. (*Id.*).   Dr. Laursen reported further that Jones must elevate her legs, at waist level or above, for at least two hours during an eight-hour work day; that she could not stand or walk for six out of eight hours per day, nor could she sit for a lengthy period. (Tr. at 420).   Dr. Laursen estimated that Jones's impairments would cause work absences more than two days a month. (*Id.*).   On the "lower extremities questionnaire," Dr. Laursen checked a box labeled "patient is incapable of sedentary work on a sustained and full-time basis." (Tr. at 418).   On the "rest questionnaire," Dr. Laursen checked a box labeled "patient requires complete freedom to rest frequently without restriction." (Tr. at 421).

The next relevant medical records document Jones's regular treatment and evaluations, for worker's compensation purposes, after an incident in which she hurt her lower back and left leg while pulling and lifting boxes at work, on October 25, 2006. (*See* Tr. at 171-243).   From November 2, 2006, through December 5, 2006, Jones was treated by Dr. Cedrick Smith ("Dr.

8

Smith"), a specialist in occupational medicine.  (Tr. at 176, 218).  Plaintiff complained to him of

lower back pain and of pain in her left inner thigh, describing it as "aching."  (Tr. at 177).  She

rated this pain as an "eight" on a ten-point scale.  (*Id*.).  Jones told Dr. Smith that she did not go

to a doctor on the date of her injury, but that, when she was injured, she experienced some chest

pains and shortness of breath.  (*Id*.).  Dr. Smith reported that Jones "had just recently gotten off

of a nine-month period of disability."  (*Id*.).  Following an examination and a series of tests, Dr.

Smith diagnosed Jones as suffering from "lumbar strain, lumbar pain, abnormal EKG, chest

pain, thigh sprain and groin sprain."  (*Id*.).  He released her to light duty work, provided that she

was allowed to sit down for 90% of the day, and to "refrain from pushing or pulling over 5

pounds."  (*Id*.).  He recommended Ibuprofen for her pain.  (*Id*.).  Jones returned to Dr. Smith on

November 10, 2006.  (*Id*.).  She told him that she had been working within the prescribed

restrictions and had been taking Ibuprofen, but did not feel that her pain had improved.  (*Id*.).

She also stated that she had seen her primary care physician about the EKG, and had been told

that "her EKG was not abnormal for her."  (*Id*.).  Dr. Smith noted that Jones was suffering from

"pain into her left inguinal region and groin and in her lower back," as well as tenderness in her

left thigh, but that the pain was not radiating elsewhere.  (Tr. at 178).  He released her, again, to

light duty, including a lift/carry limitation of ten pounds and a requirement to sit for 30% of the

day.  (*Id*.).  He also referred her for physical therapy.  (*Id*.).  On December 1, 2006, Plaintiff

reported a 50% improvement to her symptoms.  (*Id*.).  On that day, however, Dr. Smith

examined Jones, and found that she was having muscle spasms in her spine and left inguinal

area.  (*Id*.).  He reported that she had a full range of motion, and a normal gait.  (*Id*.).  As a result

of his examination, Dr. Smith kept Jones on light duty and ordered an MRI of her spine.  (*Id*.).

That test revealed some disk protrusion and herniation.  (*Id*.).  On December 5, 2006, Jones

reported no improvement, and Dr. Smith referred her for a consultation with a neurosurgeon. (Tr. at 178, 221).

On December 15, 2006, Jones returned to Dr. Hume, complaining of "pain [in] both legs, buttocks and back," and numbness in her legs and feet.  (Tr. at 174, 177-78, 208-09).  He examined her, and found the following:

> tenderness over the erector muscles primarily on the left lower lumbar spine with some mild to moderate spasms and tenderness extending over the right and left iliolumbar ligaments.  Range of motion was painful, especially with forward flexion at 90 degrees and extension at 10 degrees. [Straight leg raise] was painful at greater than 60 degrees of elevation bilaterally.  Neurological evaluation was normal in the lower extremities, and there was no muscle atrophy noted.

(Tr. at 178-79).  He reviewed the results of the MRI that Dr. Smith had ordered, and he had an additional x-ray taken of her lumbar spine.  (Tr. at 179).  Dr. Hume diagnosed Jones as suffering from lumbosacral spine strain and sprain.  (*Id.*).  He also reported that Jones was experiencing pain in her left leg and knee, and numbness in her feet.  (Tr. at 213).  He recommended a continuation of physical therapy, including a back rehabilitation program, and he prescribed additional pain relief medicine.  (*Id.*).  On that date, Dr. Hume recommended that Plaintiff not return to work.  (Tr. at 213-14).  Jones saw Dr. Hume again on January 5, 2007, and reported some relief from the physical therapy.  (Tr. at 179, 204).  He again recommended that she remain off work, however, until her back symptoms improved further.  (*Id.*).  At their next appointment, on February 2, 2007, Dr. Hume reported that Jones's range of motion and pain level were improving, that the straight leg raise test results were negative, and that a neurological evaluation of the lower extremities was normal. (Tr. at 179, 207).  On February 19, 2007, Dr. Hume released her to light duty work, but her employer had no positions available at that time.  (Tr. at 179, 185).

Jones continued to improve, and, on March 2, 2007, Dr. Hume reported "an improved range of motion of the lumbar spine," negative straight leg raise, no muscle spasms, and a normal neurological examination.  (Tr. at 185).  He released her to regular duty work as of March 5, 2007.  (*Id*.).  On March 27, 2007, on referral from Dr. Hume, Jones was evaluated by Dr. Jerry Lloyd ("Dr. Lloyd"), a chiropractor, to establish an impairment rating.  (Tr. at 177, 179, 192-94, 197).  Dr. Lloyd noted that Jones "ambulated without apparent abnormality."  (Tr. at 193).  Dr. Lloyd found "intermittent muscle guarding and muscle spasms in the lumbar spine with restricted motion and moderate pain on extension and right and left lateral flexion."  (Tr. at 179).  He concluded that Jones had met maximum medical improvement ("MMI"), and had "a whole person impairment of 5%."  (Tr. at 179, 194).  Dr. Hume certified that he agreed with Dr. Lloyd's conclusions.  (Tr. at 192).  On March 27, 2007, Plaintiff returned to Dr. Hume, who reported that she was back at work on regular duty, that she was "functioning reasonably well with minimal pain in her lower back," and that she "denied leg pain."  (Tr. at 179, 191).  Through April 2007, Dr. Hume found that Jones could continue regular duty work, and he recommended home exercises and pain medications, as needed.  (Tr. at 179-84, 190-91, 227).

By October 23, 2007, however, Jones was again suffering from pain due to osteoarthritis, particularly in the right knee.  (Tr. at 357).  Dr. Hume reported that Plaintiff was to undergo a total right knee replacement procedure on October 31, 2007, and she would have to be "off work for 4 to 6 months."  (*Id*.).  The surgery took place as scheduled, and reportedly went well.  (Tr. at 325-27, 338).  When she was discharged on November 7, 2007, Dr. Hume reported that the wound appeared to be healing properly.  (Tr. at 338).  He stated that Jones was put on a physical therapy program during her stay in the hospital, but that she had not been progressing as well as he hoped.  (*Id*.).  He also noted, however, that Plaintiff had shown some improvement and could

11

ambulate independently, and that she could be discharged with arrangements for physical therapy at home.  (Tr. at 339).

On December 19, 2007, Dr. Hume determined that Jones could return to regular duty work on March 1, 2008.  (Tr. at 332-33).  On March 27, 2008, however, Dr. Hume reported that Jones could not return to work for two more months, but then might be able to return to light duty.  (Tr. at 313).  On June 19, 2008, a physical therapy evaluation found that the range of motion in Jones's right knee was only 63% of normal, and the range of motion in her left knee was 81% of normal.  (Tr. at 417).  It was also determined that Jones suffered from motor deficits in knee extension.  (*Id.*).  On July 24, 2008, another physical therapy evaluation showed a further reduction in range of motion, at  72% in the left knee, and 56% in the right knee.  (Tr. at 415).  On August 28, 2008, Jones was again examined by Dr. Hume.  (Tr. at 413-14).  Dr. Hume reported some improvement in Jones's range of motion and pain level.  (Tr. at 413).  However, he advised her to remain off work, because of her right knee problems and "moderate osteoarthritis [in the] left knee."  (Tr. at 414).  On October 3, 2008, Dr. Hume reported that Jones's condition had improved, but that she could return to work only if a light duty job were available.  (Tr. at 400).

On August 7, 2007, Jones's medical records from the worker's compensation program were sent to Dr. Donald Mauldin ("Dr. Mauldin"), an orthopedic surgeon, for his opinion.  (Tr. at 176-82).  Dr. Mauldin found that, as of March 29, 2007, Jones "most likely should not have required additional ongoing active medical care other than a home-based program of exercise." (Tr. at 180).  Dr. Mauldin also determined that Jones no longer needed prescription pain relief, because she would get effective relief from over-the-counter medications.  (Tr. at 180-81).

On June 3, 2008, Jones was examined by Dr. Beryl Harberg ("Dr. Harberg"), an internist, on behalf of the state.  (Tr. at 375-82).  Dr. Harberg noted that Jones's chief complaint was knee pain.  (Tr. at 375).  She stated that Jones experienced pain in both knees, particularly after walking or climbing steps.  (Id.).  She wrote that Jones reported the ability to walk for one block and  to stand for only 15 minutes, and that she uses a cane, but "primarily for stability," rather than for support.  (Id.).  She also observed that Jones was able to get on and off of the examination table.  (Id.).  Dr. Harberg then made the following observations:

> The patient's gait is slightly halting.  She moves around and gets on and off the examining table without difficulty.  She has normal fine and dextrous finger control.  Flexion-extension of the lumbar spine is limited to about 80° and lateral flexion to about 20° bilaterally.  Muscle strength is 5/5 in both lower extremities and 5/5 in both upper extremities.  Grip strength is 5/5 in both hands.  There is occasional crepitation felt in the left knee on full extension but no limitation of function and no limitation of motion in the right knee.

(Tr. at 377).  Dr. Harberg reported that Jones's straight leg raising test was negative bilaterally, that her reflexes were normal and equal bilaterally, and that her sensation was likewise normal. (Id.).  She concluded that Jones suffered from "[s]tatus post right total knee replacement with normal range of motion and alleged knee pain," "[p]ain in left knee with occasional crepitation on full extension but no limitation of motion," and hypertension.  (Id.).

On June 16, 2008, Dr. James Wright ("Dr. Wright"), an internist, completed a physical RFC evaluation on behalf of the state.  (Tr. at 383-90).  That evaluation appears to be based on Dr. Harberg's findings.  (See id.).  Dr. Wright listed "osteoarthritis-r[ight] knee" as the primary diagnosis, and "left knee pain" as the secondary diagnosis.  (Tr. at 383).  Dr. Wright found that Jones can lift or carry objects weighing up to 20 pounds occasionally, and objects weighing up to 10 pounds frequently.  (Tr. at 384).  He found that she can stand or walk for at least two hours in an eight-hour workday; that she can sit for six hours in an eight-hour workday; and that she can

13

push or pull objects to the extent allowed by the lift or carry weight limitations.  (*Id*.).  Dr. Wright determined that Jones can crouch or crawl frequently, but climb, balance, stoop, or kneel only occasionally.  (Tr. at 385).  He also found that Jones had no manipulative, visual, communicative, or environmental limitations.  (Tr. at 385-87).  On August 18, 2008, Dr. Jimmy Breazeale ("Dr. Breazeale"), affirmed Dr. Wright's RFC findings.  (Tr. at 398).

### *Educational Background, Work History, and Present Age*

On the date of the hearing, Jones was 58 years of age.  (Plaintiff's Motion at 3).  She had a high school education, and had completed two years of college.  (Tr. at 18).  Her past relevant work included jobs as a "customer service representative," a "mail clerk," and a "shipping and receiving clerk."  (Tr. at 20).

### *Subjective Complaints*

In her application for disability insurance benefits, Jones claimed that she had been unable to work since October 12, 2007, because of symptoms related to a "total right knee replacement," as well as osteoarthritis in her knees.  (Tr. at 125, 166).  As part of her application, Jones completed a Daily Activity Questionnaire, in which she claimed that her movement is limited because she has stiffness, numbness, and "quivering pain" in her knee.  (Tr. at 142).  She also claimed that she "can't bend down," that she cannot sit or stand for a long time, and that she needs assistance in standing.  (*Id*.).  She described these limitations as occurring daily.  (*Id*.).  Jones also said that she gets pain relief from medication, an ice pack, elevation of her legs, or lying down.  (*Id*.).  She stated that she exercises by taking short walks or by doing straight leg raises, knee bends, and "ankle pumps."  (Tr. at 143).  Jones wrote that, on an average day, she walks around the house, takes a short walk around the neighborhood, exercises, cooks, watches television, and reads the Bible.  (*Id*.).  She also stated that, with assistance, she does a "limited

14

amount" of cooking and cleaning.  (*Id.*).  Finally, Jones reported that she needs assistance with dressing and bathing.  (*Id.*).

At the hearing, Jones testified that she stopped working on October 12, 2007, for the following reasons:

> I was in a lot of pain with my knees and my legs.  I got to the point where I couldn't, my leg wouldn't function .  I couldn't move.  I [would] just stand there and then had to wait until my legs would perform.  So I wasn't able to do my job.  And I couldn't sit down like I wanted to.

(Tr. at 24).  She told the ALJ that, on October 31, 2007, shortly after she stopped working, she underwent a total right knee replacement, followed by several months of physical therapy.  (Tr. at 25, 27).  She testified that, despite these measures, she continues to suffer from pain, numbness, and swelling in her right knee.  (Tr. at 25).  Jones testified that she also suffers from pain, swelling, and soreness in the area of her left knee cap.  (Tr. at 28).  She testified, as well, that she has some wrist pain.  (Tr. at 25).  Jones told the ALJ that she experiences pain every day, and she rated this pain as a "six" on a scale of one to ten.  (Tr. at 29).  She described the pain as one that travels up her hips and to her back, and she testified that it felt "[l]ike someone is banging on there."  (Tr. at 28, 31).  She stated that, because of her symptoms, she can only walk for half a block, stand without a cane for 5 minutes, stand with a cane for 10 minutes, and sit for 15 minutes before the pain forces her to stop or to change position.  (Tr. at 32-33).  She also testified that she has problems "using the bathroom and the tub."  (Tr. at 28).  Jones testified that she gets pain relief from medication, and that the only side effect she experiences is drowsiness.  (Tr. at 29).  She testified that, during the day, she sometimes has to elevate her feet approximately 12 inches.  (Tr. at 22).  She also stated that she gets relief from lying down or

using ice packs.  (Tr. at 25).  Jones testified, as well, that she often uses a cane to help her to ambulate.  (Tr. at 31).

Jones told the ALJ that she lives with her husband in a one-story home.  (Tr. at 19).  She testified that she experiences stiffness when she wakes up, so that she sits on the edge of her bed for a few minutes before standing.  (Tr. at 36).  She stated that she then spends most of the day either lying down or sitting in a chair, reading or watching television.  (Tr. at 36-37).  She also stated that she cooks approximately three times a week, that she folds laundry, and that she occasionally goes grocery shopping.  (Tr. at 37-39).  Jones testified that she has a driver's license, but that she does not drive because of the pain.  (Tr. at 18-19).

Jones told the ALJ that she had previously held such jobs as a customer service representative, a mail clerk, and a receiving clerk, and that she was employed in all of those positions, at various times, while working at Pitney Bowes.  (Tr. at 20).  She testified that she could probably work for eight hours a day at a similar job if it allowed her to change positions and to elevate her feet at will.  (Tr. at 43, 51).  Jones also testified that she was still receiving long-term disability benefits from Pitney Bowes, based on her knee replacement surgery.  (Tr. at 49-50).  She testified further that, in March 2008, she was released by Dr. Hume to return to work for "light duty," but that Pitney Bowes told her there was no such employment available.  (*Id*.).

### Expert Testimony

At the hearing, the ALJ also heard from Susan Rapant, a vocational expert, who testified based on Jones's medical records, work history, and testimony.  (Tr. at 43).  Rapant testified that Jones's work as a customer service representative was "sedentary, semi-skilled work."  (Tr. at

44).  The ALJ then posed the following hypothetical question to the vocational expert:

> Q        . . . for the first hypothetical, I would like for you to please assume a
> hypothetical claimant of the same age, education and work experience as the
> claimant.  Also assume that I find this person as capable of performing the
> exertional demands of a broad range of sedentary work, specifically broad range
> as opposed to a full range due to the need to walk with a cane, limit lifting to five
> pounds frequently, ten pounds occasionally, and have the ability to alternate
> sitting and standing during the workday as frequently as 30 to 40 minutes if
> needed.  Do you have an opinion as to whether such a person could perform any
> of the past relevant work you've identified either as it was actually done by the
> claimant or as it it generally required to be done by employers in the national
> economy?
>
> A        Just to clarify, Your Honor.  They alternate the sitting and standing, . . . is
> that a sit/stand to stretch or to stay in that position for any length of time?
>
> Q        Sit/stand to stretch.
>
> A        I believe that she could do her past relevant work as the customer service
> rep.

(Tr. at 45).  The ALJ also asked a second hypothetical, as follows:

> Q        In the second hypothetical I would like for you to assume the same basic
> exertional limitations as described in hypothetical number one and add the need
> to elevate the feet to 12 inches on an as needed basis.  Would this eliminate the
> [customer service representative] position?
>
> A        No, I don't believe so.

(*Id*.).

Plaintiff's representative, Cynthia Lachowski, was also given an opportunity to elicit
testimony from the vocational expert.  (Tr. at 46-47).  Lachowski asked Rapant whether the
hypothetical claimants suggested by the ALJ could perform a customer service job if they had to
take time to rest, to lie down, or to elevate their feet at will.  (Tr. at 46).  Rapant replied that they
could do so if the rest periods were only for a few minutes, and could do these things primarily
during morning, lunch, and afternoon breaks.  (*Id*.).  Rapant testified that a problem would arise

only if a claimant "was resting for huge chunks at a time and couldn't get to the productivity that was expected by the end of the day." (*Id.*). Rapant also testified that such a claimant would be unable to be a customer service representative if she had to elevate her legs to waist level or above for two out of eight hours. (*Id.*). Finally, Rapant testified that a typical employer would tolerate only two absences a month. (Tr. at 47).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence. (Tr. at 8-13). From her review of the record, she determined that Jones suffers from post right knee replacement surgery and osteoarthritis in both knees. (Tr. at 10). She also found that those impairments are "severe." (*Id.*). However, she determined that Jones's condition did not meet the requirements for any of the listed impairments. (*Id.*). The ALJ found further that not only did Jones have the residual functional capacity to perform a broad range of sedentary work, but that she was capable of performing her past work as a customer service representative. (Tr. at 10-12). Finally, the ALJ concluded that Jones does not qualify as a "disabled" individual, as required for an award of benefits. (Tr. at 13). With that decision, she denied Jones's application for disability insurance benefits. (*Id.*). That denial prompted Plaintiff's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no

18

credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

In this case, Jones argues, first, that the ALJ erred, at step three of the five-step analysis, by failing to find that her condition meets or equals the requirements for any of the Listings for musculoskeletal impairments.  (Plaintiff's Motion at 4-5).  The Listings are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect."  *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990).  Each listed impairment "is defined in terms of several specific medical signs, symptoms, or laboratory test results."  *Id*. at 530.  "For a claimant to show that h[er] impairment matches a listing, it must meet all of the specified medical criteria."  *Id*.  If that impairment "manifests only some of those criteria, no matter how severely, [it] does not qualify."  *Id*.  Two of the Listings are relevant to this case.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00.  The first is Listing 1.02, which states, in pertinent part, as follows:

> 1.02  Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (*e.g*., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (*i.e*., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

*Id*. at 1.02.  The second, Listing 1.03, provides the following:

> 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

19

*Id*. at 1.03.   Both of these Listings require an "inability to ambulate effectively," which is defined in the regulations, as follows:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e*., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id*. at 1.00B.

In this case, there is ample evidence that Plaintiff can "ambulate effectively," as defined in the regulations.  *See id*.   On March 27, 2007, Dr. Lloyd reported that Jones "ambulated without apparent abnormality."  (Tr. at 193).   On the day that she was discharged from the hospital, following her knee replacement surgery, Dr. Hume stated that Jones was already able to "ambulate independently."  (Tr. at 339).   In January 2008, Dr. Laursen found that Jones suffered from decreased mobility in the knees, and determined that a handicapped sticker on her car would be a help to her.  (Tr. at 257).   However, her records make clear that it was Dr. Hume, rather than Dr. Laursen, who was examining and treating Jones for leg and knee problems.  (*See* Tr. at 245-95, 392-97).   On June 3, 2008, Dr. Harberg wrote that Jones reported an ability to

walk for a block, and to stand for 15 minutes.  (Tr. at 375).  Dr. Harberg acknowledged that Jones used a cane, but that she used it "primarily for stability" as opposed to using it for support. (*Id*.).  She also stated that, during the examination, Jones was able to get on and off the examination table without assistance.  (*Id*.).  On October 3, 2008, less than a year after surgery, Dr. Hume found that Jones could go back to work on light duty.  (Tr. at 400).  Further, Dr. Mauldin found that, as of March 29, 2007, Jones "most likely should not have required ongoing active medical care."  (Tr. at 180-81).  In addition, Jones's own statements show that she could ambulate effectively.  She stated that she was able to take short walks for exercise, both inside and out, and to walk for one half to one full block before stopping.  (Tr. at 143).  She also stated that she gets out of bed after a few minutes of stiffness, that she can do some cooking and cleaning, and that she is able to get from one place to another in her house.  (*Id*.).  She further claimed that, while she sometimes uses a cane at home, she uses it primarily when she goes outside.  (*Id*.).  Moreover, it is telling that, at the hearing, Jones told the ALJ that she believed she could return to her work on a full-time basis, provided that she be allowed to adjust positions and elevate her feet.  (Tr. at 43, 51).

In this case, then, there is sufficient record evidence to show that Jones can ambulate effectively, without the necessity of a cane or other device at all times.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00.  The evidence also supports the finding that Jones is "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  *See id*.  Because there is sufficient evidence of Jones's ability to ambulate effectively, her condition does not meet or equal the requirements of the relevant Listings.  *See Zebley*, 493 U.S. at 529-30.  As a result, the ALJ's determination on this issue should not be disturbed.  *See id*.

Plaintiff's other complaint is that the ALJ erred, at step four of the five-step analysis, by determining that she can perform her past relevant work as a "customer service representative." (Plaintiff's Motion at 4-5).   At step four of the analysis, an ALJ must determine whether a claimant is "capable of performing work she has done in the past."   *Newton*, 209 F.3d at 453. Plaintiff has the burden of proof on this issue, so that if she fails to show that she is incapable of performing previous employment, the analysis ends and a finding of no disability results.   *See Wren*, 925 F.2d at 125.   At the hearing, the vocational expert witness testified that the job of "customer service representative" is "sedentary, semi-skilled work."   (Tr. at 44).   She also testified that an individual with Jones's alleged limitations would be able to perform that work. (*Id.*).   As Plaintiff points out, at the hearing, her non-attorney representative asked the expert witness whether such an individual would be able to perfom that job if she was required to miss at least two days of work a month because of her impairments, or if she was required to elevate her legs at waist level or above for at least two out of eight hours.   (Tr. at 46-47; Plaintiff's Response at 3-4).   The expert replied that an individual with those additional requirements would be unable to perform the job of customer service representative.   (Tr. at 46-47).   However, the only doctor who suggested that Jones has these limitations was Dr. Laursen, in an October 2009 questionnaire, and she cites nothing in support of this opinion.   (Tr. at 419-22).   Further, none of Dr. Laursen's records show that she ever treated Jones for leg or joint problems; they merely note what Jones told her about Dr. Hume's care.   (Tr. at 245-95).   Further, as the ALJ points out, such a conclusion is inconsistent with the other medical and subjective evidence of record.   (Tr. at 12).

The law is clear that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons to do so.   *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Newton*, 209 F.3d at 453.   In fact, the Fifth Circuit has repeatedly stated that, as a rule, "the

opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237.   However, it is also true that "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).   And it is equally settled that an ALJ must evaluate every medical opinion that is received on a claimant's behalf, and that she cannot reject the opinion of a treating physician without "good cause" to do so.   *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455-56; *Greenspan*, 38 F.3d at 237.   "Good cause" may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence."   *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456.   But Fifth Circuit precedent is clear that:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.   *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.*   In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Id.* (quoting SSR 96-2p).   In this case, the ALJ pointed out that Dr. Laursen cited no support for her October 2009 opinion, and that Dr. Laursen had never before evaluated Jones's leg and knee problems.  (Tr. at 12-13).   She also pointed out that the opinion is inconsistent with Dr. Hume's

findings and those of other physicians, as well as at odds with Jones's own statements.  (*Id.*).
Under these circumstances, the ALJ's decision is supported by substantial evidence, and remand
is not warranted.

As a final matter, it must be acknowledged that, even had the ALJ not followed every
procedure, remand is not warranted unless Jones was prejudiced by those alleged errors.  *See
Newton*, 209 F.3d at 459.  The Fifth Circuit has explained that "where the rights of individuals
are affected, an agency must follow its own procedures, even where the internal procedures are
more rigorous than otherwise would be required." *Id.*  "If prejudice results from the violation,
the result cannot stand." *Id.*  In social security cases, a claimant establishes prejudice by
showing that, absent the error, the ALJ might have reached a different conclusion. *See id.* at
453; *Ripley*, 67 F. 3d at 557 n.22.  In this case, however, Plaintiff has not shown that she suffered
any prejudice.  The record holds substantial evidence that supports the ALJ's findings, and there
are no obvious gaps or conflicts in the evidence that should have been resolved.  The court can
do no more than determine whether an ALJ's decision is supported by substantial evidence, and
whether she followed the applicable procedures.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d
at 452 (citing *Brown*, 192 F.3d at 496).  Here, because the answers to both of these questions are
affirmative, remand is not warranted. *See id.* at 459 (quoting *Hall*, 660 F.2d at 119).

In sum, the ALJ's decision to deny disability insurance benefits to Jones was supported
by substantial evidence, and was rendered in accordance with the law governing her claim.  As a
result, the decision need not be disturbed. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452.
For these reasons, the court recommends that Defendant's motion for summary judgment be
granted, and that Plaintiff's motion for summary judgment be denied.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**, and that Plaintiff's motion for summary judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 1st day of March, 2011.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**